LESLIE A. FARFOUR v. MIMOSA GOLF CLUB, INC., AND MORGANTON HOLDING COMPANY, INC.

(Filed 28 April, 1954.)

**1. Games and Exhibitions § 3—**

The owner and operator of a golf course are not insurers of the safety of their patrons, but like the owner or operator of any place of amusement for paying patrons, are under duty to exercise ordinary care to keep the premises safe for public use for the purpose for which designed, but are not liable for mishaps, accidents or misadventures not due to negligence.

**2. Same—**

The evidence disclosed that defendants maintained a hole for water hose connection between the green of the ninth hole and the ball washer on the near side of the tenth tee, that there was a private roadway or path between the ninth green and the tenth tee, but that the hole for water hose connection was not on this roadway or path but was on uncut land and was surrounded by long grass. *Held:* The owner and operator of the golf course were under no duty to anticipate that patrons would travel in the area of the water hose connection, and were under no duty to guard against possible injury to patrons by reason of the maintenance of the hole.

**3. Same—**

Plaintiff's evidence tended to show that he parked his "caddy cart" in the tall grass between the ninth green and the tenth tee, that after driving off the tenth tee he went over to get his caddy cart, and, while looking where his ball had gone, grabbed his car and stepped in a hole maintained for water hose connection. The evidence further tended to show that while there had been a cover over this hole, no cover was over it at the time, and that while the hole was partly obscured by tall grass, it could have been seen had plaintiff looked where he was going. *Held:* The evidence discloses contributory negligence on the part of plaintiff barring recovery as a matter of law.

ERVIN, J., dissents.

APPEAL by plaintiff from *Nettles, J.,* at September-October Term, 1953, of BURKE.

Civil action to recover for personal injury sustained by plaintiff on 1 October, 1952, in the course of playing a game of golf, when he stepped into a hole,—with bell-topped terra cotta pipe casings about twelve inches

in circumference, located on the right of the ninth green and to the right of the tenth tee ("as you play off the tees"), maintained by defendants as a part of the system for watering greens and tees of the Mimosa golf course, allegedly hidden in the grass, uncovered, and without guard rail, as result of concurrent negligence of defendants.

From the pleadings, portions of which were offered in evidence by plaintiff upon the trial in Superior Court, all as shown in the record on this appeal, it appears that these pertinent facts are admitted: 1. Each of defendants is a North Carolina corporation with principal office in the town of Morganton, N. C.

2. Pursuant to the objects and powers for which the defendant corporations were organized, the Morganton Holding Company, Inc., became the owner of a large tract of land including an 18-hole golf course, near Morganton, N. C., which it leased to the Mimosa Golf Club, Inc., for several years prior to and on 1 October, 1952, under the terms of which the lessor contracted and agreed to maintain said premises as a golf course consisting of 18 holes of play and other related facilities. Defendants maintained said premises as a public amusement, and same were used by lessee as a place of amusement for its invitees including club members paying fixed fees or dues, and the general public upon payment of green fees for each day of use. And lessor contracted with lessee to maintain the premises for such uses.

3. The lessee, for several years prior to and on 1 October, 1952, offered said premises for such use to such invitees upon the payment of the fees above mentioned, and in consequence of such offering, said premises were continuously so used.

The record on this appeal also discloses that upon the trial in Superior Court plaintiff offered evidence tending to show as of 1 October, 1952: That he was, and for three or more years had been a dues-paying member of the defendant Mimosa Golf Club, Inc., which entitled him to the privilege of playing golf on the Mimosa course; that he had played golf there about three years,—quit for a year, and had started again for about three or four months,—usually playing twice a week; that he was pretty familiar with the layout of the course, knew there were eighteen greens, and saw the grass and knew the necessity of the greens being watered, and knew that these greens were watered, but, quoting him, "it was not my business how they got watered"; and that he did not know there was a hole at each green for water hose connection, and, again quoting plaintiff, "did not see that hole in my life until I saw it afterwards."

And there is evidence that there were water connections there "at different places"; and that "they are not where you drive off, not on the greens, tees and fairway."

Plaintiff further offered evidence tending to show that on the right of the tenth tee there is a "ball washer" where players usually wash their golf balls; and that the water hole, referred to as being located on the right of the ninth green, and to the right of the tenth tee, as one witness stated, "sets out from the ball washer"—6, 8 or 10 feet away, in that portion of the land lying between the green and the tee,—"it is not in the front, it is not a fairway; it is not in the rough," but had grass growing up and around the top of the exposed tile.

And plaintiff testified that "there is a private road and path leading up to the tee where the players usually walk"; that he was using a caddie cart (that is, a two-wheeled upright cart equipped with a holder for bag and clubs on the platform of it, and propelled by the player either pulling or pushing it as suits him) ; that he put his caddie cart where he usually put it,—out of the way.

Plaintiff, testifying, gave this narrative: "I was playing there October 1, 1952—playing golf with Dr. Hamer, Dr. Arney and Emory Benfield. We had proceeded to the ninth hole and had started driving off the tenth hole . . . From the time I left the ninth hole, I walked in between the ball washer and the hole, and left my caddie cart there and went on to the tenth tee . . . Emory Benfield had a caddie cart and the two doctors a caddie. We teed off—my ball going to the right as it usually does,— Emory Benfield to the left and the two doctors in the center . . . As we were finishing teeing off, Emory Benfield turned to the left and the two doctors down the center of the fairway. I went over to my caddie cart, I grabbed it and started with my right foot and stepped into this hole. I naturally looked down to see what I had gotten in there. When I stepped into it my knee popped. I did not fall—I only stepped into it, partially turning my foot . . . I went on ahead and found my ball . . . Immediately after I stepped into the hole, I looked around and looked into what I had stepped in. I saw a depression, a water hole covered with grass and a lot of dead leaves and bottles in the hole, and that was my first glance into the hole . . . the hole did not have a cover . . . there was not any fence or rail around the hole, or any warning."

Again, plaintiff testifying on cross-examination, said: "I came over from the tee where I had driven off and took hold of the cart,—started off with it. I grabbed it and was pulling it. I was looking where the ball was gone and where the doctors were."

And, on re-direct examination, plaintiff continued by saying: "Before I got hold of the cart I was looking where the ball went, first, and got the cart and started off to it. I was walking toward the cart before I got it. I grabbed the cart and turned and stepped right into the hole."

Plaintiff testified further that "the hole was not obvious." On the other hand, several of his witnesses testified that it was readily observable,

if one only looked,—"you would be bound to see it." And, in the language of the caddie master, "When going by you can see it if you look,—would pay attention."

Evidence offered by plaintiff also tends to show that there were covers for the water holes; that within 30 to 50 days prior to 1 October, 1952, the hole in question was seen to be open, no protection over it,—nothing except the grass to keep one from seeing it; that sometimes grass was over it, and sometimes not; that the height of grass about and prior to October 1952 would vary from two to four inches; that the "rough" is never at any particular height—that would depend on when it was mowed, and how much rain had occurred.

When plaintiff rested his case, defendants, and each of them, moved for judgment as of nonsuit. The motions were allowed, and judgment in accordance therewith was entered. Plaintiff excepted thereto, and appeals to Supreme Court, and assigns error.

*Edw. M. Hairfield for plaintiff, appellant.*
*Mull, Patton & Craven for defendants, appellees.*

WINBORNE, J. The principal assignment of error presented on this appeal is based upon exception to the ruling of the trial court in granting defendants' motion for judgment as of nonsuit.

While historians tell us that the game of golf was played in Scotland more than five hundred years ago, and while there have been actions at law to recover damages for injuries sustained by persons on or near golf courses when hit by golf balls in flight when driven in play, the attorneys for the parties to this appeal fail to point out, and our own search of digests and annotations of decided cases fails to reveal, any case where a patron of a golf course has sued to recover damages for injury sustained as result of stepping into any kind of hole on or about a golf course.

However, a quotation from the Scottish court, found in decisions in the United States, may provide a thoughtful reason (*Campion v. Chicago Landscape Co.*, 295 Ill. App. 225, 14 N.E. 2d 879). The quotation purports to come from *Andrew v. Stevenson*, 13 Scot. L. T. 581. It reads: "The risks of accident in golf are such, whether from those playing behind or from those meeting the player on crossing his line of play, that in my opinion no one is entitled to take part in a game without paying any attention to what is going on around and near him, and that when he receives an injury which by a little care and diligence on his part might have been escaped, he should not be entitled to claim damages for that injury."

But be that as it may, guidance may be had in our own decisions and in general principles of law in respect to the duty and liability of an

owner of a place of amusement to patrons thereof, and in respect to duty of a patron regarding his own safety.

As to the owner, the general rule is that he is not an insurer of the safety of patrons, but he owes to them only what, under particular circumstances, is "ordinary" or "reasonable" care. See Anno. 22 A.L.R. 610, citing among other cases, *Hallyburton v. Burke County Fair Asso.,* 119 N.C. 526, 26 S.E. 114, 38 A.L.R. 156, and *Smith v. Cumberland Agric. Society,* 163 N.C. 346, 79 S.E. 632, Ann. Cas. 1915 B, p. 544. See also *Everett v. Goodwin,* 201 N.C. 734, 161 S.E. 316; *Hiatt v. Ritter,* 223 N.C. 262, 25 S.E. 2d 756; *Patterson v. Lexington,* 229 N.C. 637, 50 S.E. 2d 900; *Revis v. Orr,* 234 N.C. 158, 66 S.E. 2d 652, and cases cited.

In *Smith v. Agricultural Society, supra,* the Court quotes this as the rule of liability: "The owner of a place of entertainment is charged with an affirmative, positive obligation to know that the premises are safe for the public use, and to furnish adequate appliances for the prevention of injuries which might be anticipated from the nature of the performance, and he impliedly warrants the premises to be reasonably safe for the purpose for which they are designed." See 38 Cyc. 268. To like effect is the decision in *Hiatt v. Ritter, supra.*

And in *Everett v. Goodwin, supra, Brogden, J.,* for the Court, wrote that the duty imposed by law upon the owner of a golf course "to exercise ordinary care in promulgating reasonable rules for the protection of persons who rightfully use the course, and furthermore to exercise ordinary care in seeing that the rules so promulgated for the protection of players are enforced. The owner of a golf course is not an insurer, nor is such owner liable in damages for mishaps, accidents and misadventures not due to negligence."

Moreover, in *Patterson v. Lexington, supra,* an action in which plaintiff sought to recover damages sustained by her while attending a baseball game in the park owned by defendant city and used by defendant Baseball Club as result of a fall when she stepped in a hole on an embankment where she chose to sit, this Court in opinion by *Devin, J.,* later *C. J.,* had this to say: "Baseball is an outdoor game. Those who operate a park appropriate for playing this game for the entertainment of spectators, as shown by evidence in this case, would not be expected to maintain the grass-covered slopes of an embankment on which some spectators chose to sit entirely free from roughness or unevenness or slight depressions. Defendants were not insurers of the safety of those who entered their park but were only held to the obligation of exercising due care to prevent injury which reasonably could have been foreseen and to give warning of hidden perils or unsafe conditions ascertainable by reasonable inspection," citing cases.

In the light of these principles, applied to case in hand, the defendants owed the duty to plaintiff, and those who for pay enjoyed the privilege of playing golf on the Mimosa course to exercise ordinary care to see that the course is maintained in a reasonably safe condition for the purpose for which it is designed, that is, for playing golf.

The question then arises as to whether, under the evidence in this case, the place where the water hole here involved is located is a part of the course designed for the playing of golf.

Turning to a glossary of technical terms used in the game of golf found in Encyclopedia Britannica, Vol. 10, 14 Ed., p. 503, the "course" is "the terrain over which the game is played. All ground on which play is permitted, including fairway, rough, hazards and putting greens."

"Fairway" is "the expanse of ground, extending in whole or in part from the tee to the putting green, especially prepared for play with excellent turf on which the grass is kept out."

"Rough" is "the ground to left and right of the fairway; also at times intervening between the tee and fairway, on which vegetation is allowed to grow without being cut."

"Hazard" is "the limited space or area in which the privileges of play are restricted, including bunkers, water courses, ponds, sand, etc., also recognized roadways and path."

"Green" is the "putting green" around the holes. "The tee," also termed "teeing ground" is "the place marked as the limit, outside of which it is not permitted to drive the ball off."

In the Encyclopedia Americana, Vol. 13, at page 37, referring to "golf," it is said: "The object of the game is to knock the ball from an established starting point to a designated finishing point in the fewest possible strokes. Golf is played on a course or links, which consist usually of nine or eighteen holes. A hole, designating a unit of play, consists of a starting point, or teeing ground, a finishing place, or putting green, and the intervening area. Rules of the game recognize four-part division of the course: (1) Teeing ground, (2) through the green, (3) hazards, and (4) putting green. Markers placed on an area especially prepared for teeing, determine the limits of the teeing ground. Putting green is also a specially prepared area, in the surface of which is cut a hole four and one-fourth inches in diameter. The area within a radius of the hole of 60 feet, except hazards, is putting green. Hazards are ditches, creeks, ponds, roads and bunkers. A bunker, which is an artificial hazard, is a hole or depression . . . and is usually covered with sand. Bunkers are also called sand traps. Through the green is the whole area between the teeing ground and the putting green, except hazards. It includes both fairway and rough. The former applies to that part of the area on which

the turf is specially prepared for play. The balance, except hazards, is rough."

And the New Funk & Wagnall's Encyclopedia, p. 5870, states: "Golf, an outdoor game, played on a stretch of ground known as a course or links by two or more players, each player using a small, hard, white ball which he propels by means of specially designed clubs. The object of the game is to drive the ball around the course, using as few strokes as possible, and playing successively from the beginning or 'tee' to the end or 'cup' of each of the eighteen sections, known as 'holes' into which the course is divided . . . The players begin at the first 'tee,' a level area of turf or sand, generally raised slightly above the surrounding terrain, and each player successively drives his ball onto the 'fairway' or main part of the course, a strip of land on which the grass has been cut to provide a good lie for the ball. On either side of the fairway is an area left in its wild or natural state . . . At the far end of the fairway is the 'green,' an area of closely cropped grass surrounding the cup . . ."

Similar definitions to those in the encyclopedias may be found in Webster's International Dictionary.

Hence, in the light of these well established and generally recognized definitions of golf terms, and of the rules of the game of golf, applied to the evidence offered by plaintiff, as shown in the case on appeal, it appears that the place where the water hole here involved was located is no part of the terrain designed for playing the game of golf. Too, it was beyond the area of the ball washer. And elsewhere there was a private road and path leading from the ninth green to the tenth tee. Therefore, it would seem, and the Court holds that defendants, the owner and operator of the golf course, were under no duty to anticipate that patrons would travel in the area of the water hole and to guard against possible injury to them by reason of the hole.

But in any event, the evidence clearly indicates that plaintiff was negligent, and that his negligence, at least, contributed to the injury and damage of which he complains. He chose not to follow the road and path where players usually walk in going from the ninth green to the tenth tee. Rather, he chose to take a short cut from the ninth green to the tenth tee, and en route to park his caddie cart at a place in high grass. This necessitated his return to the cart, and that he take off from that point rather than from the front of the tee. Moreover, his own statement clearly indicates that he was intent upon locating the spot at which his ball was last seen. He says: "I was looking where the ball was gone." "Before I got hold of the cart I was looking where the ball went, first," that he "grabbed" the cart, turned and started with his right foot and stepped into the hole. Then it was that he first glanced into the hole.

Thus, in either aspect of the case, judgment as of nonsuit was properly entered.

Affirmed.

ERVIN, J., dissents.